# EXHIBIT 2



AMERICAN ARBITRATION ASSOCIATION®  INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

*For Consumer or Employment cases, please visit **www.adr.org** for appropriate forms.*

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

| Name of Respondent: Shugert Family Investments, LLC | Name of Representative (if known): Scott M. Zurakowski, Esq. |
|---|---|

Address:

63568 County Home Road

Name of Firm (if applicable): Krugliak, Wilkins, Griffiths & Dougherty, Co. L.P.A.

Representative's Address: 4775 Munson Street, N.W. / P.O. Box 36963

| City: Lore City | State: OH | Zip Code: 43755 | City: Canton | State: OH | Zip Code: 44735 |
|---|---|---|---|---|---|
| Phone No.: | Fax No.: | | Phone No.: 330-497-0700 | | Fax No.: 330-497-4020 |
| Email Address: | | | Email Address: szurakowski@kwgd.com | | |

The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

Brief Description of the Dispute:

Declaratory action -- Gulfport is seeking a declaration that Gulfport paid royalties consistent with language in the Oil and Gas Leases at issue.

| Dollar Amount of Claim: $ N/A | Other Relief Sought: ☐ Attorneys Fees ☐ Interest ☐ Arbitration Costs ☐ Punitive/ Exemplary ☐ Other |
|---|---|

Amount enclosed: $ $750          In accordance with Fee Schedule: ☐ Flexible Fee Schedule ☑ Standard Fee Schedule

Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute:

Experience arbitrating oil and gas royalty disputes.

Hearing locale: Oklahoma City, Oklahoma          *(check one)* ☑ Requested by Claimant ☐ Locale provision included in the contract

| Estimated time needed for hearings overall:  hours or  days | Type of Business: Claimant: Oil and gas exploration and production  Respondent: Landowner - Livestock/Cattle |
|---|---|

Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each other? No

| Signature (may be signed by a representative): /s/ Daniel T. Donovan | Date: 03/27/2017 |
|---|---|

| Name of Claimant: Gulfport Energy Corp. | Name of Representative: Daniel T. Donovan |
|---|---|

Address (to be used in connection with this case):

14313 North May Avenue, Suite 100

Name of Firm (if applicable): Kirkland & Ellis LLP

Representative's Address: 655 Fifteenth Street, N.W.

| City: Oklahoma City | State: OK | Zip Code: 73134 | City: Washington | State: DC | Zip Code: 20005 |
|---|---|---|---|---|---|
| Phone No.: 405-848-8807 | Fax No.: | | Phone No.: 202-879-5174 | | Fax No.: 202-879-5200 |
| Email Address: zsimpson@gulfportenergy.com | | | Email Address: daniel.donovan@kirkland.com | | |

To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100 Voorhees, NJ 08043. At the same time, send the original Demand to the Respondent.

*Please visit our website at www.adr.org if you would like to file this case online. AAA Case Filing Services can be reached at 877-495-4185.*

## AMERICAN ARBITRATION ASSOCIATION

_____

| | |
|---|---|
| **Gulfport Energy Corporation** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )  Arb. No. _____ |
| | ) |
| **Shugert Family Investments, LLC** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

## <u>DEMAND FOR DECLARATORY RELIEF</u>

Plaintiff Gulfport Energy Corporation ("Gulfport") initiates this action against Defendant Shugert Family Investments, LLC ("Defendant") and states as follows:

1.      Gulfport is an oil and gas exploration and production company.  As part of its business, Gulfport acquires leases granting it the right to explore for and produce oil, gas, and other hydrocarbons.

2.      Defendant entered into oil and gas leases and an addendum ("Leases") with Patriot Land Company, LLC ("Patriot").  Copies of the Leases at issue here are attached as Exhibit A.  Gulfport has an interest in the Leases.  Pursuant to the Leases, Gulfport has the right to explore for and produce gas from Defendant's property.  In exchange, Defendant receives the right to royalty payments.

3.      Gulfport seeks a single declaration: Gulfport seeks a declaration that it paid royalties consistent with the language of the Leases.

## <u>THE PARTIES</u>

4.      Gulfport is a Delaware corporation with its principal place of business in Oklahoma City, Oklahoma.

5.     Defendant is a limited liability company organized under the laws of the state of Ohio.

## JURISDICTION

6.     This matter is properly before the American Arbitration Association as an individual arbitration because the Leases contain arbitration clauses stating:

> ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this Lease or the associated Order of Payment, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive remedy and cover all disputes, including but not limited to, the formation, execution, validity and performance of the Lease and Order of Payment. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

*See* Ex. A at 6.

## FACTS

7.     In May 2011, K & S Shugert Farm Family Limited Partnership entered into the Leases with Patriot Land Company LLC. Defendant acquired the Leases from K & S Shugert Farm Family Limited Partnership in August 2012.

8.     Gulfport acquired an interest in the Leases from Patriot on June 30 and November 22, 2011.

### The Leases

9.     The calculation of royalties is governed by the terms of the Leases.

10.     The Leases contain a "Payments to Lessor" clause that provides, in part, as follows:

> PAYMENTS TO LESSOR. In addition to the bonus payment paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership as follows: …
>
> (B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

2

1. OIL: To deliver to the credit of Lessor a Royalty equal to fifteen percent (15%) of the gross revenue realized by Lessee for all oil and any constituents thereof produced and marketed from the Leasehold, less the cost to transport, handle, separate, meter, treat, process and market the oil.

2. GAS: To pay Lessor an amount equal to fifteen percent (15%) of the gross revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, gather, dehydrate, compress, market, meter, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee.

*See* Ex. A at 3.

11.     In the Addendum, the Leases also contain a Market Enhancement Clause

("MEC") that provides:

Market Enhancement Clause - It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, dehydrating and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements.  However, in no event shall Lessor receive a price that is less than, or more than, the price received by Lessee.

*See* Ex. A at 9.

12.     In the Addendum, the Leases also contain an "Audit" provision:

Audit- Lessor shall have the right to request an itemized list of deductions from Lessee once in any 12 month period by written request.

*See* Ex. A at 12.

## COUNT ONE

### Declaratory Relief

13.     Gulfport incorporates by reference the preceding paragraphs as set forth herein.

14.     Pursuant to the Leases, Gulfport has already paid Defendant Shugert Family

Investments, LLC over $9 million.

15.     Defendant claims that Gulfport owes it additional royalties. Its leading argument is that the deduction language in the MEC is "subservient" to the first sentence of the clause and therefore should be ignored.  Defendant also maintains that Gulfport charged deductions it did not actually incur.

16.     Gulfport maintains that it paid royalties consistent with the language of the Leases.

17.     The gas produced from Defendant's property, pursuant to the Leases, is marketable at or near the wellhead.

18.     The post-production costs incurred from the time the gas is marketable at or near the wellhead until the point of downstream sale enhance the value of the gas.

19.     Because the gas produced from Defendant's property is marketable at or near the wellhead, and because the post-production costs enhance the value of that marketable gas, Gulfport is and was entitled to include a pro rata share of post-production costs in calculating the royalties due.

20.     Furthermore, the relevant post-production costs are and have been based on Gulfport's actual cost of such enhancements.

21.     Moreover, royalties paid to Defendant have not been based on a price that is less than the price received by Gulfport.

22.     Gulfport is thus entitled to a declaration that it paid royalties consistent with the language of the Leases.

4

## **PRAYER FOR RELIEF**

WHEREFORE, Gulfport respectfully requests judgment as follows:

(a)     A declaration that the Leases provide that Gulfport may charge a pro rata share of post-production costs incurred to enhance the value of the marketable gas against the lessor's royalty;

(b)     A declaration that Gulfport paid royalties to Defendant consistent with the language of the Leases; and

(c)     Provide such other and further relief as the arbitrator may deem proper.

DATED:  March 27, 2017                          Respectfully submitted,


                                                _____*/s/ Daniel T. Donovan*_____
                                                Daniel T. Donovan
                                                Ragan Naresh
                                                KIRKLAND & ELLIS LLP
                                                655 Fifteenth St. NW, Suite 1200
                                                Washington, DC  20005

                                                *Counsel for Gulfport Energy Corporation*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 27, 2017, true and correct copies of the foregoing were

served on the following by email:

William G. Williams
Scott M. Zurakowski
Matthew W. Onest
KRUGLIAK, WILKINS, GRIFFITHS & DOUGHERTY CO., L.P.A.
475 Munson Street, N.W./P.O. Box 36963
Canton, Ohio 44735
Tel: (330) 479-0700

*Attorneys for Shugert Family Investments, LLC*


_____*/s/ Daniel Donovan*_____
Daniel T. Donovan

*Counsel for Gulfport Energy Corporation*

# EXHIBIT A

GP-PHIJ-128

**PAID-UP**
**OIL & GAS LEASE**

740-489-5270

This Lease made 01-04-11, by and between: **K and S Shugert Farms Limited Partnership, Family Limited Partnership,** whose address is 63568 County Home Rd, Lore City, OH 43755 hereinafter collectively called "Lessor,"
and
Patriot Land Company, LLC, whose address is 7716 Depot Rd, Unit 1, Lisbon OH 44432, hereinafter called "Lessee."

WITNESSETH, that for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

**LEASING CLAUSE.** Lessor hereby leases exclusively to Lessee all the oil and gas (including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mined-out area, coal seam, and all communicating zones), and their liquid or gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, to operate, maintain, repair, and remove material and equipment; to use and occupy the subsurface for a wellbore or wellbores to drill across, through and under the Leasehold.

**DESCRIPTION.** The Leasehold is located in the Township of Kirkwood, in the County of Belmont, in the State of Ohio, and described as follows:
Township: 9   Range: 6
Section: 7 Tax Parcel No.: 12-00233.000, 12-00234.000, 12-00460.000

and is bounded formerly or currently as follows:
On the North by lands of        ; Ralston
On the East by lands of         ; Small tracts
On the South by lands of        ; K&S
On the West by lands of         ; Barriklow



3821
OGL

including lands acquired from   , by virtue of deed dated   , and recorded in Belmont County Book: ~~259~~, at Page: ~~107~~ and described for the purposes of this agreement as containing a total of 258.16000000000003 Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument, or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land. ☛ Source deed D784/844

LEASE TERM. This Lease shall remain in force for a primary term of Five (5) years from 12:00 A.M.    01-04-2011 (effective date) to 11:59 P.M.    01-03-2016 (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend

this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.

NO AUTOMATIC TERMINATION OR FORFEITURE.
(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits

and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE:  This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including but not limited to, making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice.  If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR.  In addition to the bonus payment paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership as follows:

(A) DELAY RENTAL:  To pay Lessor as Delay Rental, after the first year, at a rate of five dollars ($5.00) per net acre per year payable in advance.  The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

1. OIL:  To deliver to the credit of Lessor a Royalty equal to fifteen percent (15%) of the gross revenue realized by Lessee for all oil and any constituents thereof produced and marketed from the Leasehold, less the cost to transport, handle, separate, meter, treat, process and market the oil.

2. GAS:  To pay Lessor an amount equal to fifteen percent (15%) of the gross revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, gather, dehydrate, compress, market, meter, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee.  Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) DELAY IN MARKETING:  In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that is awaiting completion (such as hydraulic fracture stimulation), or that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D) SHUT-IN:  In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands

pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) DAMAGES: Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F) MANNER OF PAYMENT: Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP: Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H) TITLE: If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS: Lessee may at its option pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means. In the event the leased lands are encumbered by a prior mortgage, then, notwithstanding anything contained herein to the contrary, Lessee shall have the right to suspend the payment of any royalties due hereunder, without liability for interest, until such time as Lessor obtains at its own expense a subordination of the mortgage in a form acceptable to Lessee.

(J) CHARACTERIZATION OF PAYMENTS: Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked. Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease. Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K) PAYMENT REDUCTIONS: If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING. Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. Lessor agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease, and the local property tax assessment calculation of the lands covered by the Lease, or the deeded acreage amount, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES. Lessee shall not drill a well on the Leasehold within 300 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE. Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage. At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

DISPOSAL AND INJECTION WELLS. Lessor hereby grants to Lessee the right to drill wells and/or re-enter existing wells, including necessary location, roadway and pipeline easements and rights of way, on any part of the Leasehold or lands pooled or unitized therewith for the disposal and/or injection into any subsurface strata, other than a potable water strata, of air, gas, brine, completion and production fluids, waste water and any hydrocarbon related substances from any source, including, but not limited to wells on the Leasehold or lands pooled or unitized therewith or from properties and lands outside the Leasehold or lands pooled or unitized therewith, and to conduct all operations as may be required, for so long as necessary and required by Lessee for purposes as herein provided. If, at the expiration of the primary term, Lessee is disposing and/or injecting into any subsurface strata underlying the Leasehold or lands pooled or unitized therewith or conducting operations for such disposal and/or injection and this lease is not being maintained by any other provision contained herein and no other payments are being made to Lessor as prescribed hereunder, Lessee shall pay to Lessor the sum of one thousand dollars ($1,000.00) per year, proportionately reduced to Lessor's ownership in the Leasehold and surface as it bears to the full and undivided estate, beginning on the next anniversary date of this Lease and said payment and term of this Lease, insofar as to terms and provisions contained herein applicable to disposal and injection wells, shall

continue annually thereafter for so long as necessary and required by Lessee for purposes as herein provided and until all disposal and/or injection wells located on the Leasehold or on lands pooled or unitized therewith are plugged and abandoned. Lessor agrees that if required by Lessee, regulatory agency or governmental authority having jurisdiction, Lessor shall enter a separate Disposal and Injection Agreement with Lessee for the purposes as herein provided.

**TITLE AND INTERESTS.** Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease, the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

**LEASE DEVELOPMENT.** There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants. Provisions herein, including but not limited, to the prescribed payments, constitute full compensation for the privileges herein granted.

**COVENANTS.** This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts of God and/or third parties over whom Lessee has no control.

**ARBITRATION.** In the event of a disagreement between Lessor and Lessee concerning this Lease or the associated Order of Payment, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive remedy and cover all disputes, including but not limited to, the formation, execution, validity and performance of the Lease and Order of Payment. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

**ENTIRE CONTRACT.** The entire agreement between Lessor and Lessee is embodied herein and in the associated Order of Payment (if any). No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

**TITLE CURATIVE.** Lessor agrees to execute affidavits, ratifications, amendments, permits and other instruments as may be necessary to carry out the purpose of this lease.

**SURRENDER.** Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

**SUCCESSORS.** All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

**FORCE MAJEURE.** All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably

within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY. This Lease is intended to comply with all applicable laws, rules, regulations, ordinances and governmental orders. If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall survive and continue in full force and effect to the maximum extent allowed by law. If a court of competent jurisdiction holds any provision of this Lease invalid, void, or unenforceable under applicable law, the court shall give the provision the greatest effect possible under the law and modify the provision so as to conform to applicable law if that can be done in a manner which does not frustrate the purpose of this Lease.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

SEE EXHIBIT "a" ATTACHED HERETO AND BY REFERENCE MADE A PART HEREOF.

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

**LESSOR**

Witness _____

*Kenneth Shugert G.P.*
*K+S Shugert Farms L.P.*
Printed Name: K&S Shugert Farms Limited Partnership

Witness _____

X *Kenneth Shugert*

Printed Name:_____

Witness _____

X *Sandra Shugert*

Printed Name:_____

## ACKNOWLEDGMENT

STATE OF _Ohio_ )
) ss
COUNTY OF _Belmont_ )

_Kenneth Shuger_ On this _5_ day of _May_____, 2011, before me, a Notary Public, personally appeared known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that he/she executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

**Robert Dickey, Notary Public**
**STATE OF OHIO**
**My Commission Expires May 19, 2013**

Signature/Notary Public: _____

Name/Notary Public (print): _____

My Commission Expires: _____

## ACKNOWLEDGMENT

STATE OF _Ohio_ )
) ss
COUNTY OF _Columbiana_ )

_Andrew Blackson_ On this _5_ day of _May_____, 2011, before me, a Notary Public, personally appeared who acknowledged himself to be the _____ of Patriot Land Company, LLC, and that in that capacity, being authorized to do so, executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Signature/Notary Public: _____

Name/Notary Public (print): _____

My Commission Expires: _____



**Elizabeth S. Edenbaugh, Notary Public**
**STATE OF OHIO**
**My Commission Expires February 16, 2016**

1.01 Patriot Lease 01411

## EXHIBIT "a"

This Exhibit "a" is attached to and made a part of that certain Oil and Gas Lease dated the     01-04-2011, by and between K&S Shugert Farms Limited Partnership, as Lessor,

and

Patriot Land Company, LLC, as Lessee. If any of the following provisions conflict with or are inconsistent with the printed provisions or terms of this Lease, the following provisions shall control.

**Lessor hereby warrants that Lessor is not currently receiving any bonus, rental, production royalty as the result of any prior oil and gas lease covering any or all of the subject premises, and that there are no commercially producing wells currently existing on the subject premises, or upon other lands within the boundaries of a drilling or production unit utilizing all or a part of the subject premises.**

1. **Governing Law** - This Agreement shall be governed by and construed in accordance with the laws of the Columbiana County Courts.

2. **Market Enhancement Clause** - It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, dehydrating and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements. However, in no event shall Lessor receive a price that is less than, or more than, the price received by Lessee. (From incurring these costs)

   *[margin note: enhanced=made greater; increase or comprehends any increase of value.]*

3. **No Storage Rights Clause** - Lessee agrees the herein described Leased premises shall not be used for the purpose of gas storage as defined by the Federal Energy Regulatory Commission. Any reference to gas storage contained in this lease is hereby deleted. If Lessor wishes to enter into an agreement regarding gas storage using the leased premises with a third party, Lessor shall first give Lessee written notice of the identity of the third party, the price or the consideration for which the third party is prepared to offer, the effective date and closing date of the transactions and any other information respecting the transaction which Lessee believes would be material to the exercise of the offering. Lessor does hereby grant Lessee the first option and right to purchase the gas storage rights by matching and tendering to the Lessor any third party's offering within 30 days if receipt of notice from Lessor.

4. **Water Testing** - Prior to the commencement of drilling operations by Lessee, Lessee shall test Lessor's water supply well if located within 500 feet (500') of the surface location of the proposed drilling well bore. Should Lessor experience a material adverse change in the quality of Lessor's water supply as the result of the drilling of any such well by Lessee, during or within two months after the completion of Lessee's drilling operations, Lessee shall promptly after receipt of Lessor's written request, sample and test Lessor's water supply at Lessee's expense. Should such test reflect a material adverse change as the result of Lessee's drilling operations, Lessee, at Lessee's expense, agrees to provide Lessor with potable water until such time as Lessor's water sources has been repaired or replaced with a source of substantially similar quality.

5. **No Disposal Clause** - The right to dispose of any waste products, including, but not limited to, waste water and/or brine upon the leased premises is specifically excluded.

6. **Use Of Water Clause** - Upon the express written consent of Lessor, Lessee shall have the right to drill one water well on Lessor's premises for uses associated with Lessee's operations except said well shall not be used for injection, hydraulic fracking or drilling. The right to utilize any other potable water and/or water from currently existing wells, tanks, ponds, reservoirs or any

other source located on the leased premises is specifically excluded without the express written consent from the Lessor under a separate agreement.

7.  **Timber** - Lessee and Lessor agree that prior to the removal of any and all marketable timber resulting from Lessee's operations under the terms of this Lease, a qualified third party forester shall conduct an appraisal, and Lessee shall pay Lessor the said appraisal value prior to harvesting.

8.  **Clean Up** - On completion of any operations, Lessee shall restore the leased premises to pre-drilling conditions, remove all debris, equipment and personal property which Lessee placed on the leased premises (except for equipment needed for the operation of producing wells), which shall be removed within six (6) months after a well permanently ceases to produce.

9.  **Prohibition Activities** - Lessee is prohibited from conducting aerial spraying upon any portion of Lease Premises. Lessee is prohibited from burning of brush or other waste materials upon any portion of the leased premises unless temporary during drilling. Lessee is prohibited from placing living quarters of any type on the leased premises. Lessee is prohibited from performing any activity which is not expressly permitted pursuant to the terms and conditions of this Lease.

10. **Reclamation** – Lessee shall construct or install all well sites, access roads and pipeline rights-of-way in manner which would minimize any related soil erosion. Further, all related surface reclamation shall be done in a manner which restores said land as nearly to original contours as reasonably possible.

11. **Fences and Gates** – Lessee shall promptly replace any fences removed by Lessee during its operations on said land and further shall construct gates on all access roads on said land upon request of Lessor

12. **Hold Harmless** – Lessee shall indemnify and hold Lessor harmless from any and all liability, liens, demands, judgments, suits, and claims of any kind or character arising out of, in connection with, or relating to Lessee's operations under the terms of this Lease, including, but not limited to, environmental issues, claims for injury to or death of any persons, or damage, loss or destruction of any property, real or personal, under any theory of tort, contract, or strict liability. Lessee further covenants and agrees to defend any suits brought against Lessor on any claims, and to pay any judgment against Lessor resulting from any suit or suits, together with all costs and expenses relating to any claims, including attorney's fees, arising from Lessees operations under the terms of this lease. Lessor, if it so elects, shall have the right to participate, at it sole expense, in its defense in any suits in which it may be a party, without relieving Lessee of the obligation to defend Lessor.

13. **Gas Compensation** - If, and only if, Lessor is entitled to receive free gas by virtue of the ownership of the surface of the leased premises on which the wellhead is located and either all the oil and gas underlying the same, or an undivided interest in the oil and gas underlying the same, or the express record title right to receive free gas, then upon approval of Lessor's written request for free gas, and after Lessor has obtained 100% written consent from all owners having the legal right to receive revenue from a productive well on the leased premises, and Lessor's execution of Lessee's Delivery of Free Gas and Overburn Gas productive Agreement, one (1) Lessor may lay a line to any one (1) producing gas well on the leased premises and take up to two hundred thousand (200,000) cubic feet of gas during any single twelve (12) month period for domestic use in one currently existing primary dwelling owned at all times by Lessor and located within a one thousand (1,000') foot radius from said well on the leased premises; subject, however to such well being capable of producing in commercial quantities and of commercial quality suitable for domestic use; the existence and availability of a local distribution company willing to administer, control, monitor, and service such free gas usage to the specifications and requirements of Lessee; and subject further to the use, maintenance, operation, production, limited deliverability, and right of shut-in and/or plugging and abandonment by Lessee of its well(s), equipment and pipelines on the leased premises. Lessor shall secure such gas by service line laid to and connected to such well on said leased premises in accordance with all applicable laws, rules and regulations, the point of connection to be designated by Lessee and Lessor shall assume the entire risk and all expenses associated with securing and using such gas and agrees, to the fullest extent of applicable law, to

release and indemnify Lessee from and against any and all claims or causes of action arising there from or relating thereto. If Lessor in any year uses in excess of the quantity provided for herein, Lessor shall pay for all overburn gas at the current established retail rate in the area or at the rated charged by the local distribution company administering the free gas usage, but Lessee assumes no obligation to furnish Lessor with gas in excess of the quantity provided herein. The measurement and regulation of such gas shall be by meter regulators furnished by Lessor, subject to Lessee's approval, and set at the tap on the well. Notwithstanding the foregoing provisions, in the event the leased premises are made a part of a unit or pooled with other acreage and the well(s) has been drilled on another lease, the Lessor hereunder will not be entitled to use wellhead gas, free or otherwise. The rights granted herein related to free gas are not assignable or transferable to a party not currently owning an interest in the leasehold premises. Notwithstanding the foregoing, the specific terms and conditions of free gas use shall be governed and controlled by the Agreement for Delivery of Free Gas and Overburn Gas. Lessee shall be fully relieved of any further obligation to provide free gas or alternative payment to Lessor if any of the conditions provided hereinabove are not satisfied. At the time application is made for free gas, Lessee shall have the option to make an annual cash payment to the qualified applicant of One Thousand and 00/100 Dollars ($1,000.00) in lieu of providing free gas and said sum shall thereafter permanently discharge Lessee's obligation under this lease to provide gas free of cost to Lessor, his successors, heirs and assigns.

14. **No Other Minerals** – This lease shall cover only oil and gas and related hydrocarbons (but no coal bed methane) that may be produced from the well bore; and all other minerals including, but not limited to, lignite coal, uranium, sulfur, gravel, copper, and metallic ores are not included in this Lease.

15. **Shut In** - It is understood and agreed that this lease may not be maintained in force for any continuous period of time longer than four (4) consecutive years after the expirations of the primary term hereof solely by the provision of the shut-in royalty clause. The shut-in status of any well shall persist only so long as it is necessary to correct, through the exercise of good faith and due diligence, the condition giving the rise to the shut-in of the well.

16. **Pugh Clause** – In the event a pooled unit is created which encompasses land located outside the lease premises and some, but not all, of the Leasehold premises, any drilling completing, testing, deepening operations or reworking operations on or production from a well located on that pooled unit shall continue this Lease in full force and effect but only as to that part of the lease premises contained within the pooled unit and only as to those formations and horizons found from the surface down to the deepest depth drilled; specifically, this lease shall automatically terminate two (2) years ("Extended Term") after the expiration of the primary term or any extension provided herein as to such portions of leased premises not contained within a pooled unit and those formations and horizons below the deepest depth drilled. However, Lessee may, at its option, pay the extension payment included in this lease one time, and one time only, prior to the expiration of the two (2) year Extended Term on the portions of the Leasehold not included in a production unit or below the deepest depth drilled to continue all of its rights in and to the Leasehold or surrender such portions of the Leasehold not included in a production unit or those formations and horizons found below the deepest depth drilled.

17. **Location Approval** - Before commencing surface disturbing operations on the Leased Premises, Lessee agrees to consult with Lessor on the location of all wells, roads, pipelines, gates, and other equipment so as to minimize disruption of Lessor's use of the Leased Premises. To the degree practicable, operations shall be designed and laid out to be concentrated in a single area so as to avoid unnecessary utilization of surface areas. To the degree practicable, pipelines and roadways are to be within the same corridor. Without a separate written agreement between Lessor and Lessee, no pump stations, tank batteries, pipelines, dryers or separators shall be located on the Leased Premises unless they are for the sole purpose of transporting, processing, or treating gas from the Leased Premises or lands pooled or unitized therewith, and those shall not be located nearer than, (and no well shall be drilled nearer than) four hundred (400) feet from any dwelling or

residential structure or two hundred (200) feet from any barn or other non-residential structure then on the Leased Premises without the Lessor's written consent.

18. **Setbacks** - No Drilling within four hundred (400) feet from any dwelling or residential structure or two hundred (200) feet from any barn or other non-residential structure then on the Leased Premises without the Lessor's written consent.

19. **Well Location Fee** - Lessee agrees to pay Lessor a well location fee in the amount of **Ten Thousand Dollars ($10,000.00)** for the initial well site, provided a well site is built on the surface owned by the lessor, and such land is covered by this lease. This Well Location Fee shall be for the entire compensation for all reasonable and customary damages caused by operations of Lessee, its employees, contractors, sub-contractors, agents and representatives, pursuant to and including, but not limited to, the drilling, equipping, operating, repairing, reworking, maintaining, laying of well site gathering and flow lines, and for plugging of an oil and/or gas well on Lessor's property. Said compensation does not include damages to Lessor's surface area and vegetation from any catastrophic incidents (i.e. fires, sinkholes, etc.) caused by operations by Lessee, its employees, contractors, sub-contractors, agents or representatives.

20. **Commencement of Operations** – Commencement of Operations shall be defined as Lessee having secured a drilling permit from the State and further entering upon the herein premises with equipment necessary to build any access road(s) for drilling of a well subsequently followed within 6 months by a drilling rig for the spudding of the well to be drilled. Once drilling operations commence, any applicable delay rentals will no longer be required to maintain the lease.

21. **Audit**- Lessor shall have the right to request an itemized list of deductions from Lessee once in any 12 month period by written request.

22. **Unitization/Pooling**- No pooled unit for any well that includes lateral or horizontal drilling shall exceed six hundred forty (640) acres.

23. **Payments to Lessor** -To pay Lessor as Delay Rental, a rate of two thousand dollars ($2000.00) *$2090.00* per net acre payable in advance for a period of five years, "initial term". The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof. Payment of any delay rental during the five year Primary Term shall be deemed paid in advance as part of the initial bonus payment to Lessor. If royalties paid to Lessor, for any period of time in affect except for that period the amount of the delay rental, then the delay rental shall be deemed offset by the royalty payments, and no delay rental shall be owed for that period.

24. **Payment** – Lease payment will be due on or before June 30, 2011.

This addendum to lease dated _____ day of _____, 2011 is consented hereto, by:

Lessor:                                              Lessee:

Printed Name: _X Kenneth Sheigart_        Patriot Land Company, LLC
_X Sandra Sheigart_                           By: _Andrew W Blockson_

                                              Printed Name: _Andrew W Blockson_
                                              Its: _Member_

**PAID-UP**
**OIL & GAS LEASE**

This Lease made 01-04-2011, by and between: **K and S Shugert Farms Limited Partnership, a Family Limited Partnership**, whose address is 63568 County Home Rd, Lore City, OH 43755 hereinafter collectively called "Lessor,"
and
**Patriot Land Company, LLC**, whose address is 7716 Depot Rd, Unit 1, Lisbon OH 44432, hereinafter called "Lessee."

WITNESSETH, that for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

LEASING CLAUSE. Lessor hereby leases exclusively to Lessee all the oil and gas (including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mined-out area, coal seam, and all communicating zones), and their liquid or gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, to operate, maintain, repair, and remove material and equipment; to use and occupy the subsurface for a wellbore or wellbores to drill across, through and under the Leasehold.

DESCRIPTION. The Leasehold is located in the Township of Kirkwood, in the County of Belmont, in the State of Ohio, and described as follows:

Township: 9    Range: 6
Section: 7 Tax Parcel No.: 12-00460.001, 12-00504.000, 12-00504.001, 12-00236.001, 12-00503.001

and is bounded formerly or currently as follows:

| | |
|---|---|
| On the North by lands of | ; K&S |
| On the East by lands of | ; Small Tracts |
| On the South by lands of | ; K&S |

**EXHIBIT**
**1-B**

On the West by lands of   ; Barricklow

including lands acquired from   , by virtue of deed dated   , and recorded in Belmont County Book: 257, at Page: 129, and described for the purposes of this agreement as containing a total of 131.68000000000001 Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument, or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

LEASE TERM. This Lease shall remain in force for a primary term of Five (5) years from 12:00 A.M.   01-04-2011 (effective date) to 11:59 P.M.   01-04-2016 (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend

this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.

NO AUTOMATIC TERMINATION OR FORFEITURE.

(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits

and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including but not limited to, making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR. In addition to the bonus payment paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership as follows:

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at a rate of five dollars ($5.00) per net acre per year payable in advance. The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

1. OIL: To deliver to the credit of Lessor a Royalty equal to fifteen percent (15%) of the gross revenue realized by Lessee for all oil and any constituents thereof produced and marketed from the Leasehold, less the cost to transport, handle, separate, meter, treat, process and market the oil.

2. GAS: To pay Lessor an amount equal to fifteen percent (15%) of the gross revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, gather, dehydrate, compress, market, meter, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) DELAY IN MARKETING: In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that is awaiting completion (such as hydraulic fracture stimulation), or that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D) SHUT-IN: In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is

re-established (or lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) DAMAGES: Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F) MANNER OF PAYMENT: Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP: Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to receive or withhold payments as if such a change had not occurred.

(H) TITLE: If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS: Lessee may at its option pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means. In the event the leased lands are encumbered by a prior mortgage, then, notwithstanding anything contained herein to the contrary, Lessee shall have the right to suspend the payment of any royalties due hereunder, without liability for interest, until such time as Lessor obtains at its own expense a subordination of the mortgage in a form acceptable to Lessee.

(J) CHARACTERIZATION OF PAYMENTS: Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked. Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease. Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K) PAYMENT REDUCTIONS: If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING. Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased,

whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. Lessor agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease, and the local property tax assessment calculation of the lands covered by the Lease, or the deeded acreage amount, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES. Lessee shall not drill a well on the Leasehold within 300 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE. Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage. At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

DISPOSAL AND INJECTION WELLS. Lessor hereby grants to Lessee the right to drill wells and/or re-enter existing wells, including necessary location, roadway and pipeline easements and rights of way, on any part of the Leasehold or lands pooled or unitized therewith for the disposal and/or injection into any subsurface strata, other than a potable water strata, of air, gas, brine, completion and production fluids, waste water and any hydrocarbon related substances from any source, including, but not limited to wells on the Leasehold or lands pooled or unitized therewith or from properties and lands outside the Leasehold or lands pooled or unitized therewith, and to conduct all operations as may be required, for so long as necessary and required by Lessee for purposes as herein provided. If, at the expiration of the primary term, Lessee is disposing and/or injecting into any subsurface strata underlying the Leasehold or lands pooled or unitized therewith or conducting operations for such disposal and/or injection and this lease is not being maintained by any other provision contained herein and no other payments are being made to Lessor as prescribed hereunder, Lessee shall pay to Lessor the sum of one thousand dollars ($1,000.00) per year, proportionately reduced to Lessor's ownership in the Leasehold and surface as it bears to the full and undivided estate, beginning on the next anniversary date of this Lease and said payment and term of this Lease, insofar as to terms and provisions contained herein applicable to disposal and injection wells, shall continue annually thereafter for so long as necessary and required by Lessee for purposes as herein provided and until all disposal and/or injection wells located on the Leasehold or on lands pooled or unitized therewith are plugged and abandoned. Lessor agrees that if required by Lessee, regulatory agency

or governmental authority having jurisdiction, Lessor shall enter a separate Disposal and Injection Agreement with Lessee for the purposes as herein provided.

**TITLE AND INTERESTS.** Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease, the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

**LEASE DEVELOPMENT.** There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants. Provisions herein, including but not limited, to the prescribed payments, constitute full compensation for the privileges herein granted.

**COVENANTS.** This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts of God and/or third parties over whom Lessee has no control.

**ARBITRATION.** In the event of a disagreement between Lessor and Lessee concerning this Lease or the associated Order of Payment, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive remedy and cover all disputes, including but not limited to, the formation, execution, validity and performance of the Lease and Order of Payment. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

**ENTIRE CONTRACT.** The entire agreement between Lessor and Lessee is embodied herein and in the associated Order of Payment (if any). No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

**TITLE CURATIVE.** Lessor agrees to execute affidavits, ratifications, amendments, permits and other instruments as may be necessary to carry out the purpose of this lease.

**SURRENDER.** Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

**SUCCESSORS.** All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

**FORCE MAJEURE.** All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for

failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY. This Lease is intended to comply with all applicable laws, rules, regulations, ordinances and governmental orders. If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall survive and continue in full force and effect to the maximum extent allowed by law. If a court of competent jurisdiction holds any provision of this Lease invalid, void, or unenforceable under applicable law, the court shall give the provision the greatest effect possible under the law and modify the provision so as to conform to applicable law if that can be done in a manner which does not frustrate the purpose of this Lease.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

SEE EXHIBIT "a" ATTACHED HERETO AND BY REFERENCE MADE A PART HEREOF.

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

LESSOR

_H+S Shugert Farms L.P._
_by Kenneth Shugert GP._

Witness _____

Printed Name: _____

X

_Kenneth Shugert_

Witness _____

Printed Name: _____

X

_Sandra Shugert_

Witness _____

Printed Name: _____

**ACKNOWLEDGMENT**

STATE OF _Ohio_ )

COUNTY OF _Belmont_ ) ss
)

On this _5_ day of _May_____, 2011, before me, a Notary Public, personally appeared
_Kenneth Stewart_, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within
instrument, and acknowledged that he/she executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Robert Dickey, Notary Public
**STATE OF OHIO**
My Commission Expires May 19, 2013

Signature/Notary Public _Robert E. Dickey_

Name/Notary Public (print): _____

My Commission Expires: _____

**ACKNOWLEDGMENT**

STATE OF _Ohio_ )

COUNTY OF _Belmont_ ) ss
)

On this _5_ day of _May_____, 2011, before me, a Notary Public, personally appeared
_Andrew Jackson_, who acknowledged himself to be the _member_ of Patriot Land Company, LLC, and that
in that capacity, being authorized to do so, executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Signature/Notary Public _____

Elizabeth S. Eckenbaugh, Notary Public
**STATE OF OHIO**
My Commission Expires February 16, 2016

Name/Notary Public (print) _____

My Commission Expires: _____

1.02 Patriot Lease 010411-Gulfport supplement lease (OGL 3822-Final)

EXHIBIT "a"

This Exhibit "a" is attached to and made a part of that certain Oil and Gas Lease dated the      **01-04-2011**, by and
between K&S Shugart Farms , as Lessor,

and

Patriot Land Company, LLC, as Lessee.  If any of the following provisions conflict with or are inconsistent with the
printed provisions or terms of this Lease, the following provisions shall control.

**Lessor hereby warrants that Lessor is not currently receiving any bonus, rental, production royalty as the result
of any prior oil and gas lease covering any or all of the subject premises, and that there are no commercially
producing wells currently existing on the subject premises, or upon other lands within the boundaries of a
drilling or production unit utilizing all or a part of the subject premises.**

1. **Governing Law** - This Agreement shall be governed by and construed in accordance with the
   laws of the Columbiana County Courts.
2. **Market Enhancement Clause** - It is agreed between the Lessor and Lessee that, notwithstanding
   any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this
   lease or by state law shall be without deduction, directly or indirectly, for the cost of producing,
   gathering, storing, dehydrating and marketing the oil, gas and other products produced hereunder
   to transform the product into marketable form;  however, any such costs which result in enhancing
   the value of the marketable oil, gas or other products to receive a better price may be deducted
   from Lessor's share of production so long as they are based on Lessee's actual cost of such
   enhancements.  However, in no event shall Lessor receive a price that is less than, or more than,
   the price received by Lessee.
3. **No Storage Rights Clause** - Lessee agrees the herein described Leased premises shall not be used
   for the purpose of gas storage as defined by the Federal Energy Regulatory Commission.  Any
   reference to gas storage contained in this lease is hereby deleted.  If Lessor wishes to enter into an
   agreement regarding gas storage using the leased premises with a third party, Lessor shall first
   give Lessee written notice of the identity of the third party, the price or the consideration for which
   the third party is prepared to offer, the effective date and closing date of the transactions and any
   other information respecting the transaction which Lessee believes would be material to the
   exercise of the offering.  Lessor does hereby grant Lessee the first option and right to purchase the
   gas storage rights by matching and tendering to the Lessor any third party's offering within 30
   days if receipt of notice from Lessor.
4. **Water Testing** - Prior to the commencement of drilling operations by Lessee, Lessee shall test
   Lessor's water supply well if located within 500 feet (500') of the surface location of the proposed
   drilling well bore.  Should Lessor experience a material adverse change in the quality of Lessor's
   water supply as the result of the drilling of any such well by Lessee, during or within two months
   after the completion of Lessee's drilling operations, Lessee shall promptly after receipt of Lessor's
   written request, sample and test Lessor's water supply at Lessee's expense.  Should such test
   reflect a material adverse change as the result of Lessee's drilling operations, Lessee, at Lessee's
   expense, agrees to provide Lessor with potable water until such time as Lessor's water sources has
   been repaired or replaced with a source of substantially similar quality.
5. **No Disposal Clause** - The right to dispose of any waste products, including, but not limited to,
   waste water and/or brine upon the leased premises is specifically excluded.
6. **Use Of Water Clause** – Upon the express written consent of Lessor,  Lessee shall have the right
   to drill one water well on Lessor's premises for uses associated with Lessee's operations except
   said well shall not be used for injection, hydraulic fracking or drilling. The right to utilize any
   other potable water and/or water from currently existing wells, tanks, ponds, reservoirs or any
   other source located on the leased premises is specifically excluded without the express written
   consent from the Lessor under a separate agreement.

7. **Timber** - Lessee and Lessor agree that prior to the removal of any and all marketable timber resulting from Lessee's operations under the terms of this Lease, a qualified third party forester shall conduct an appraisal, and Lessee shall pay Lessor the said appraisal value prior to harvesting.

8. **Clean Up** - On completion of any operations, Lessee shall restore the leased premises to pre-drilling conditions, remove all debris, equipment and personal property which Lessee placed on the leased premises (except for equipment needed for the operation of producing wells), which shall be removed within six (6) months after a well permanently ceases to produce.

9. **Prohibition Activities** - Lessee is prohibited from conducting aerial spraying upon any portion of Lease Premises. Lessee is prohibited from burning of brush or other waste materials upon any portion of the leased premises unless temporary during drilling. Lessee is prohibited from placing living quarters of any type on the leased premises. Lessee is prohibited from performing any activity which is not expressly permitted pursuant to the terms and conditions of this Lease.

10. **Reclamation** – Lessee shall construct or install all well sites, access roads and pipeline rights-of-way in manner which would minimize any related soil erosion. Further, all related surface reclamation shall be done in a manner which restores said land as nearly to original contours as reasonably possible.

11. **Fences and Gates** – Lessee shall promptly replace any fences removed by Lessee during its operations on said land and further shall construct gates on all access roads on said land upon request of Lessor

12. **Hold Harmless** – Lessee shall indemnify and hold Lessor harmless from any and all liability, liens, demands, judgments, suits, and claims of any kind or character arising out of, in connection with, or relating to Lessee's operations under the terms of this Lease, including, but not limited to, environmental issues, claims for injury to or death of any persons, or damage, loss or destruction of any property, real or personal, under any theory of tort, contract, or strict liability. Lessee further covenants and agrees to defend any suits brought against Lessor on any claims, and to pay any judgment against Lessor resulting from any suit or suits, together with all costs and expenses relating to any claims, including attorney's fees, arising from Lessees operations under the terms of this lease. Lessor, if it so elects, shall have the right to participate, at it sole expense, in its defense in any suits in which it may be a party, without relieving Lessee of the obligation to defend Lessor.

13. **Gas Compensation** - If, and only if, Lessor is entitled to receive free gas by virtue of the ownership of the surface of the leased premises on which the wellhead is located and either all the oil and gas underlying the same, or an undivided interest in the oil and gas underlying the same, or the express record title right to receive free gas, then upon approval of Lessor's written request for free gas, and after Lessor has obtained 100% written consent from all owners having the legal right to receive revenue from a productive well on the leased premises, and Lessor's execution of Lessee's Delivery of Free Gas and Overburn Gas productive Agreement, one (1) Lessor may lay a line to any one (1) producing gas well on the leased premises and take up to two hundred thousand (200,000) cubic feet of gas during any single twelve (12) month period for domestic use in one currently existing primary dwelling owned at all times by Lessor and located within a one thousand (1,000') foot radius from said well on the leased premises; subject, however to such well being capable of producing in commercial quantities and of commercial quality suitable for domestic use; the existence and availability of a local distribution company willing to administer, control, monitor, and service such free gas usage to the specifications and requirements of Lessee; and subject further to the use, maintenance, operation, production, limited deliverability, and right of shut-in and/or plugging and abandonment by Lessee of its well(s), equipment and pipelines on the leased premises. Lessor shall secure such gas by service line laid to and connected to such well on said leased premises in accordance with all applicable laws, rules and regulations, the point of connection to be designated by Lessee and Lessor shall assume the entire risk and all expenses associated with securing and using such gas and agrees, to the fullest extent of applicable law, to release and indemnify Lessee from and against any and all claims or causes of action arising there from or relating thereto. If Lessor in any year uses in excess of the quantity provided for herein, Lessor shall pay for all overburn gas at the current established retail rate in the area or at the rated

release and indemnify Lessee from and against any and all claims or causes of action arising there from or relating thereto. If Lessor in any year uses in excess of the quantity provided for herein, Lessor shall pay for all overburn gas at the current established retail rate in the area or at the rated charged by the local distribution company administering the free gas usage, but Lessee assumes no obligation to furnish Lessor with gas in excess of the quantity provided herein. The measurement and regulation of such gas shall be by meter regulators furnished by Lessor, subject to Lessee's approval, and set at the tap on the well. Notwithstanding the foregoing provisions, in the event the leased premises are made a part of a unit or pooled with other acreage and the well(s) has been drilled on another lease, the Lessor hereunder will not be entitled to use wellhead gas, free or otherwise. The rights granted herein related to free gas are not assignable or transferable to a party not currently owning an interest in the leasehold premises. Notwithstanding the foregoing, the specific terms and conditions of free gas use shall be governed and controlled by the Agreement for Delivery of Free Gas and Overburn Gas. Lessee shall be fully relieved of any further obligation to provide free gas or alternative payment to Lessor if any of the conditions provided hereinabove are not satisfied. At the time application is made for free gas, Lessee shall have the option to make an annual cash payment to the qualified applicant of One Thousand and 00/100 Dollars ($1,000.00) in lieu of providing free gas and said sum shall thereafter permanently discharge Lessee's obligation under this lease to provide gas free of cost to Lessor, his successors, heirs and assigns.

14. **No Other Minerals -** This lease shall cover only oil and gas and related hydrocarbons (but no coal bed methane) that may be produced from the well bore; and all other minerals including, but not limited to, lignite coal, uranium, sulfur, gravel, copper, and metallic ores are not included in this Lease.

15. **Shut In -** It is understood and agreed that this lease may not be maintained in force for any continuous period of time longer than four (4) consecutive years after the expirations of the primary term hereof solely by the provision of the shut-in royalty clause. The shut-in status of any well shall persist only so long as it is necessary to correct, through the exercise of good faith and due diligence, the condition giving the rise to the shut-in of the well.

16. **Pugh Clause –** In the event a pooled unit is created which encompasses land located outside the lease premises and some, but not all, of the Leasehold premises, any drilling completing, testing, deepening operations or reworking operations on or production from a well located on that pooled unit shall continue this Lease in full force and effect but only as to that part of the lease premises contained within the pooled unit and only as to those formations and horizons found from the surface down to the deepest depth drilled; specifically, this lease shall automatically terminate two (2) years ("Extended Term") after the expiration of the primary term or any extension provided herein as to such portions of leased premises not contained within a pooled unit and those formations and horizons below the deepest depth drilled. However, Lessee may, at its option, pay the extension payment included in this lease one time, and one time only, prior to the expiration of the two (2) year Extended Term on the portions of the Leasehold not included in a production unit or below the deepest depth drilled to continue all of its rights in and to the Leasehold or surrender such portions of the Leasehold not included in a production unit or those formations and horizons found below the deepest depth drilled.

17. **Location Approval –** Before commencing surface disturbing operations on the Leased Premises, Lessee agrees to consult with Lessor on the location of all wells, roads, pipelines, gates, and other equipment so as to minimize disruption of Lessor's use of the Leased Premises. To the degree practicable, operations shall be designed and laid out to be concentrated in a single area so as to avoid unnecessary utilization of surface areas. To the degree practicable, pipelines and roadways are to be within the same corridor. Without a separate written agreement between Lessor and Lessee, no pump stations, tank batteries, pipelines, dryers or separators shall be located on the Leased Premises unless they are for the sole purpose of transporting, processing, or treating gas from the Leased Premises or lands pooled or unitized therewith, and those shall not be located nearer than, (and no well shall be drilled nearer than) four hundred (400) feet from any dwelling or

residential structure or two hundred (200) feet from any barn or other non-residential structure then on the Leased Premises without the Lessor's written consent.

18. **Setbacks** - No Drilling within four hundred (400) feet from any dwelling or residential structure or two hundred (200) feet from any barn or other non-residential structure then on the Leased Premises without the Lessor's written consent.

19. **Well Location Fee** - Lessee agrees to pay Lessor a well location fee in the amount of Ten Thousand Dollars ($10,000.00) for the initial well site, provided a well site is built on the surface owned by the lessor, and such land is covered by this lease. This Well Location Fee shall be for the entire compensation for all reasonable and customary damages caused by operations of Lessee, its employees, contractors, sub-contractors, agents and representatives, pursuant to and including, but not limited to, the drilling, equipping, operating, repairing, reworking, maintaining, laying of well site gathering and flow lines, and for plugging of an oil and/or gas well on Lessor's property. Said compensation does not include damages to Lessor's surface area and vegetation from any catastrophic incidents (i.e. fires, sinkholes, etc.) caused by operations by Lessee, its employees, contractors, sub-contractors, agents or representatives.

20. **Commencement of Operations** -- Commencement of Operations shall be defined as Lessee having secured a drilling permit from the State and further entering upon the herein premises with equipment necessary to build any access road(s) for drilling of a well subsequently followed within 6 months by a drilling rig for the spudding of the well to be drilled. Once drilling operations commence, any applicable delay rentals will no longer be required to maintain the lease.

21. **Audit**- Lessor shall have the right to request an itemized list of deductions from Lessee once in any 12 month period by written request.

22. **Unitization/Pooling**- No pooled unit for any well that includes lateral or horizontal drilling shall exceed six hundred forty (640) acres.

23. **Payments to Lessor** -To pay Lessor as Delay Rental, a rate of two thousand dollars ($2000.00) *#2000.00* per net acre payable in advance for a period of five years, "initial term". The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof. Payment of any delay rental during the five year Primary Term shall be deemed paid in advance as part of the initial bonus payment to Lessor. If royalties paid to Lessor, for any period of time in affect except for that period the amount of the delay rental, then the delay rental shall be deemed offset by the royalty payments, and no delay rental shall be owed for that period.

24. **Payment** -- Lease payment will be due on or before June 30, 2011.

This addendum to lease dated _____ day of _____, 2011 is consented hereto, by:

Lessor:                                    Lessee:

Printed Name: *Kenneth Glugart*            Patriot Land Company, LLC
X *Glandra Glugart*                        By: *Alw Block*

                                           Printed Name: *Andrew W. Blocksom*
                                           Its: *Member*

Case: 4:17-cv-00263-BYP Doc #: 1-1 Filed: 02/08/17 48 of 90. PageID #: 54

**PAID-UP**

**OIL & GAS LEASE**

This Lease made this 4 day of January 2011, by and between: K-8 Stuegert Farms, Limited Family PTR whose address is 63568 County Home Road, Lore City, Ohio 43755 hereinafter collectively called "Lessor,"

and

Parlac Land Company, LLC, whose address is 7716 Depot Rd, Unit 1, Lisbon OH 44432, hereinafter called "Lessee."

WITNESSETH, that for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

LEASING CLAUSE. Lessor hereby leases exclusively to Lessee all the oil and gas (including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, existing from, or produced/emanating within any formation, gob area, mined-out area, coal seam, and all commuting zones), and their liquid or gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment; to use and occupy the subsurface for a wellbore or wellbores to drill across, through and under the Leasehold.

DESCRIPTION. The Leasehold is located in the Township of Warren, in the County of Belmont, in the State of Ohio, and described as follows:

Township: 8 Range: 6
Section: 12, 18 Tax Parcel No.: 41-00558.000, 41-00559.000, 41-00560.000

and is bounded formerly or currently as follows:
On the North by lands of K & 8;
On the East by lands of Smoll Tract;
On the South by lands of Blue;
On the West by lands of Kohler;

including lands acquired from _____, and recorded in
Belmont County Book: _____ at Page: _____, by virtue of deed dated _____ and described for the purposes of this agreement as



**EXHIBIT**
**1-C**

QCC

3335

containing a total of 181,314 Leasehold acres, whether actually more or less, and including contiguous lands held by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument, or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessor for a more complete or accurate description of said land.

**LEASE TERM.** This Lease shall remain in force for a primary term of Five (5) years from 12:00 A.M. January 4, 2011 (effective date) to 11:59 P.M. January 3, 2016 (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mineral or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

**EXTENSION OF PRIMARY TERM.** Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.

**NO AUTOMATIC TERMINATION OR FORFEITURE.**

(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lease shall be deemed to be producing in search of oil or gas, or their constituents, if the Lease is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over

whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including but not limited to, making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR. In addition to the bonus payment paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership as follows:

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at a rate of five dollars ($5.00) per net acre per year payable in advance. The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

1. OIL: To deliver to the credit of Lessor a Royalty equal to fifteen percent (15%) of the gross revenue realized by Lessee for all oil and any constituents thereof produced and marketed from the Leasehold, less the cost to transport, handle, separate, meter, treat, process and market the oil.

2. GAS: To pay Lessor an amount equal to fifteen percent (15%) of the gross revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, gather, dehydrate, compress, market, meter, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) DELAY IN MARKETING: In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that is awaiting completion (such as hydraulic fracture stimulation), or that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D) SHUT-IN: In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is

Case: 4:17-cv-00263-BYP Doc #: 1-1 Filed: 02/08/17 51 of 90. PageID #: 57

formation or from a different formation. In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) DAMAGES: Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F) MANNER OF PAYMENT: Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP: Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H) TITLE: If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS: Lessee may at its option pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means. In the event the leased lands are encumbered by a prior mortgage, then, notwithstanding anything contained herein to the contrary, Lessee shall have the right to suspend the payment of any royalties due hereunder, without liability for interest, until such time as Lessor obtains at its own expense a subordination of the mortgage in a form acceptable to Lessee.

(J) CHARACTERIZATION OF PAYMENTS: Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoiced. Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease. Lessee recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessee hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon any differing terms which Lessor has or will negotiate with any other lessor/oil and gas owner.

(K) PAYMENT REDUCTIONS: If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties, and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING. Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the

right to change the size, shape, and conditions of operation or payment of any unit created. Lessor agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each such well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease, and the local property tax assessment calculation of the lands covered by the Lease, or the deeded acreage amount, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES. Lessee shall not drill a well on the Leasehold within 300 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE. Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage. At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

DISPOSAL AND INJECTION WELLS. Lessor hereby grants to Lessee the right to drill wells and/or re-enter existing wells, including necessary location, roadway and pipeline easements and rights of way, on any part of the Leasehold or lands pooled or unitized therewith for the disposal and/or injection into any subsurface strata, other than a potable water strata, of air, gas, brine, completion and production fluids, waste water and any hydrocarbon related substances from any source, including, but not limited to wells on the Leasehold or lands pooled or unitized therewith or from properties and lands outside the Leasehold or lands pooled or unitized therewith, and to conduct all operations as may be required, for so long as necessary and required by Lessee for purposes as herein provided. If, at the expiration of the primary term, Lessee is disposing and/or injecting into any subsurface strata underlying the Leasehold or lands pooled or unitized therewith or conducting operations for such disposal and/or injection and this lease is not being maintained by any other provision contained herein and no other payments are being made to Lessor as prescribed hereunder, Lessee shall pay to Lessor the sum of one thousand dollars ($1,000.00) per year, proportionately reduced to Lessor's ownership in the Leasehold and surface as it bears to the full and undivided estate, beginning on the next anniversary date of this Lease and said payment and term of this Lease, insofar as to terms and provisions contained herein applicable to disposal and injection wells, shall continue annually thereafter for so long as necessary and required by Lessee for purposes as herein provided and until all disposal and/or injection wells located on the Leasehold or on lands pooled or unitized therewith are plugged and abandoned. Lessor agrees that if required by Lessee, regulatory agency or governmental authority having jurisdiction, Lessor shall enter a separate Disposal and Injection Agreement with Lessee for the purpose as herein provided.

TITLE AND INTERESTS. Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the

doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease, the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

**LEASE DEVELOPMENT.** There is no implied covenant to drill, prevent drainage, further develop or market production within the primary terms of any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenant. Provisions herein, including but not limited, to the prescribed payments, constitute full compensation for the privileges herein granted.

**COVENANTS.** This Lease and is expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state or local law, regulation, or decree, or the acts of God and/or third parties over whom Lessee has no control.

**ARBITRATION.** In the event of a disagreement between Lessor and Lessee concerning this Lease or the associated Order of Payment, performance thereunder, or damages caused by Lessee's operation, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive remedy and cover all disputes, including but not limited to, the formation, execution, validity and performance of the Lease and Order of Payment. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

**ENTIRE CONTRACT.** The entire agreement between Lessor and Lessee is embodied herein and in the associated Order of Payment (if any). No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

**TITLE CURATIVE.** Lessor agrees to execute affidavits, ratifications, amendments, permits and other instruments as may be necessary to carry out the purpose of this Lease.

**SURRENDER.** Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

**SUCCESSORS.** All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

**FORCE MAJEURE.** All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

**SEVERABILITY.** This Lease is intended to comply with all applicable laws, rules, regulations, ordinances and governmental orders. If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall survive and continue in full force and effect to the maximum extent allowed by law. If a court of competent jurisdiction holds any

provision of this Lease invalid, void, or unenforceable under applicable law, the court shall give the provision the greatest effect possible under the law and modify the provision so as to conform to applicable law if that can be done in a manner which does not frustrate the purpose of this Lease.

    COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

SEE EXHIBIT "A" ATTACHED HERETO AND BY REFERENCE MADE A PART HEREOF.

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

LESSOR:  K-S Shugert Farms

*Kenneth R. Shugert*

Printed Name: Kenneth R. Shugert

Witness _____

*Sandra K. Shugert*

Printed Name: Sandra K. Shugert

Witness _____

**ACKNOWLEDGMENT**

STATE OF OHIO )
                    ) ss
COUNTY OF *Columbiana* )

    On this 5th day of *August* , 2011, before me, a Notary Public, personally appeared Kenneth R. Shugert and Sandra K. Shugert, Husband and Wife, known to me (or satisfactorily

proven) to be the person whose name is subscribed to the within instrument, and acknowledged that he/she executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Signature/Notary Public: _____

Name/Notary Public (print): _____

My Commission Expires: _____

## ACKNOWLEDGMENT

STATE OF OHIO)

COUNTY OF _Columbiana_ ) ss

On this _5th_ day of _August_____, 2011, before me, a Notary Public, personally appeared _Andrew Blocksom_ who acknowledged himself to be the _President_ of Patriot Land Energy Corporation, and that in that capacity, being authorized to do so, executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Signature/Notary Public: _____

Elizabeth F. Eshabaugh, Notary Public    Name/Notary Public (print): _Elizabeth S Eshabaugh_
STATE OF OHIO
My Commission Expires February 16, 2013    My Commission Expires: _____

Case: 4:17-cv-00263-BYP Doc #: 1-1 Filed: 02/08/17 56 of 90. PageID #: 62

1.03 Patriot Lease 010411

EXHIBIT "A"

This Exhibit "A" is attached to and made a part of a certain Oil and Gas Lease dated the 4 day of January, 2011, by and between KS Shugart Farms, Limited Family Partners as Lessor,

and

Patriot Land Company, LLC, as Lessee. If any of the following provisions conflict with or are inconsistent with the printed provisions or terms of this Lease, the following provisions shall control.

Lessor hereby warrants that Lessor is not currently receiving any bonus, rental, production royalty or other benefit of any kind on said lands covering on all of the subject premises, and that there are no outstanding proceeds owing to Lessor from any existing lease on the subject premises, or any other lease within the boundaries of a drilling or production unit utilizing all or a part of the subject premises.

1. Governing Law - This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio.

2. Market Enhancement Clause - It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease or by some law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, dehydrating and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessor's actual cost of such enhancements. However, in no event shall Lessor receive a price that is less than, or more than, the price received by Lessee.

3. No Storage Rights Clause - Lessee agrees the herein described Leased premises shall not be used for the purpose of gas storage as defined by the Federal Energy Regulatory Commission. Any reference to gas storage contained in this lease is hereby deleted. If Lessor wishes to enter into an agreement regarding gas storage under the leased premises with a third party, Lessor shall first give Lessee written notice of the identity of the third party, the price of the consideration for which the third party is prepared to offer, the effective date and closing date of the transactions and any other information respecting the transaction which Lessee believes would be material to the exercise of the offering. Lessor does hereby grant Lessee the first option and right to purchase the gas storage rights by matching and tendering to the Lessor any third party's offering within 30 days if/except of notice from Lessor.

4. Water Testing - Prior to the commencement of drilling operations by Lessee, Lessee shall test Lessor's water supply well if located within 500 feet (500') of the surface location of the proposed drilling well bore. Should Lessor experience a material adverse change in the quality of Lessor's water supply as the result of the drilling of any such well by Lessee, during or within two months after the completion of Lessee's drilling operations, Lessee shall promptly after receipt of Lessor's written request, sample and test Lessor's water supply at Lessee's expense. Should such test reflect a material adverse change as the result of Lessee's drilling operations, Lessee, at Lessee's expense, agree to provide Lessor with potable water until such time as Lessor's water source has been repaired or replaced with a source of substantially similar quality.

5. No Disposal Clause - The right to dispose of any waste products, including but not limited to, waste water and/or brine upon the leased premises is specifically excluded.

6. Use Of Water Clause — Upon the express written consent of Lessor, Lessee shall have the right to drill one water well on Lessor's premises for use associated with Lessee's operations except said well shall not be used for injection, hydraulic fracking or drilling. This right to utilize any other potable water and/or water from currently existing wells, tanks, ponds, reservoirs or any

other source located on the leased premises is specifically excluded without the express written consent from the Lessor under a separate agreement.

7.   Timber — Lessee and Lessor agree that prior to the removal of any and all merchantable timber resulting from Lessee's operations under the term of this Lease, a qualified third party forester shall conduct an appraisal, and Lessee shall pay Lessor the said appraised value prior to harvesting.

8.   Clean Up — On completion of any operation, Lessee shall restore the leased premises to pre-drilling conditions, remove all debris, equipment and personal property which Lessee placed on the leased premises (except for equipment needed for the operation of producing wells), which shall be removed within six (6) months after a well permanently ceased to produce.

9.   Prohibition Activities – Lessee is prohibited from conducting aerial spraying upon any portion of Lease Premises. Lessee is prohibited from burning of brush or other waste material upon any portion of the leased premises unless temporary during drilling. Lessee is prohibited from placing living quarters of any type on the leased premises. Lessee is prohibited from performing any activity which is not expressly permitted pursuant to the terms and conditions of this Lease.

10.  Reclamation — Lessee shall construct or install all well sites, access roads and pipeline rights-of-way in manner which would minimize any related well erosion. Further, all related surface reclamation shall be done in a manner which restores said land as nearly to original contours as reasonably possible.

11.  Fences and Gates — Lessee shall promptly replace any fence removed by Lessee during its operations on said land and further shall construct gates on all access roads on said land upon request of Lessor

12.  Hold Harmless — Lessee shall indemnify and hold Lessor harmless from any and all liability, liens, demands, judgments, suits, and claims of any kind or character arising out of, in connection with, or relating to Lessee's operations under the terms of this Lease, including, but not limited to, environmental issues, claims for injury or death of any persons, or damage, loss or destruction of any property, real or personal, under any theory of tort, contract, or strict liability. Lessee insofar covenants and agrees to defend any suits brought against Lessor on any claims, and to pay any judgment against Lessor resulting from any suit or suits, together with all costs and expenses relating to any claims, including attorney's fees, arising from Lessee's operations under the terms of this lease. Lessor, if it so elects, shall have the right to participate, at it sole expense, in its defense in any suits in which it may be a party, without relieving Lessee of the obligation to defend Lessor.

13.  Gas Compensation – If, and only if, Lessor is entitled to receive free gas by virtue of the ownership of the surface of the leased premises on which the wellhead is located and after all the oil and gas underlying the same, or an undivided interest in the oil and gas underlying the same, or the express record title right to receive free gas, then upon approval of Lessor's written request for free gas, and after Lessor has obtained 100% written consent from all owners having the legal right to receive revenue from a productive well on the leased premises, and Lessor's execution of Lessor's Delivery of Free Gas and Overburn Gas productive Agreement, one (1) Lessor may lay a line to any one (1) producing gas well on the leased premises and take up to two hundred thousand (200,000) cubic feet of gas during any single twelve (12) month period for domestic use in one currently existing primary dwelling owned at all times by Lessor and located within a one thousand (1,000') foot radius from said well on the leased premises; subject, however to such well being capable of producing in commercial quantities and of commercial quality suitable for domestic use; the existence and availability of a local distribution company willing to administer, control, monitor, and service such free gas usage to the specifications and requirements of Lessor; and subject further to the use, maintenance, operation, production, limited deliverability, and right of Lessee to market such gas by service line laid to end connected to such well of Lessor's premises. Lessee shall assume such free gas usage the entire risk and all expenses on said leased premises in accordance with all applicable laws, rules and regulations, the point of connection to be designated by Lessor and Lessor shall assume the entire risk and all expenses associated with securing and using such gas and agrees, to the fullest extent of applicable law, to release and indemnify Lessee from and against any and all claims or causes of action arising there from or relating thereto. If Lessor in any year uses in excess of the quantity provided for herein,

Lessor shall pay for all overhaul gas at the current established retail rate in the area or at the rate charged by the local distribution company administering the free gas usage, but Lessor assumes no obligation to furnish Lessor with gas in excess of the quantity provided herein. The measurement and regulation of such gas shall be by meter regulators furnished by Lessor, subject to Lessor's approval, and set at the tap on the well. Notwithstanding the foregoing provisions, in the event the leased premises are made a part of a unit or pooled with other acreage and the well(s) has been drilled on another tract, the Lessor hereunder will not be entitled to use wellhead gas, free or otherwise. The rights granted herein related to free gas are not assignable or transferable to a party not currently owning an interest in the household premises. Notwithstanding the foregoing, the applicable terms and conditions of free gas use shall be governed and controlled by the Agreement for Delivery of Free Gas and Overburn Gas. Lessee shall be fully relieved of any further obligation to provide free gas or alternative payment to Lessor if any of the conditions provided hereinabove are not satisfied. At the time application is made for free gas, Lessee shall have the option to make an annual cash payment to the qualified applicant of One Thousand and 00/100 Dollars ($1,000.00) in lieu of providing free gas and said sum shall thereafter permanently discharge Lessor's obligation under this lease to provide gas free of cost to Lessor, his successors, heirs and assigns.

14. No Other Minerals - This lease shall cover only oil and gas and related hydrocarbons (but no coal bed methane) that may be produced from the well bore, and all other minerals including, but not limited to, lignite, coal, uranium, sulfur, gravel, copper, and metallic ores are not included in this Lease.

15. Shut In - It is understood and agreed that this lease may not be maintained in force for any continuous period of time longer than four (4) consecutive years after the expiration of the primary term hereof solely by the provisions of the shut-in royalty clause. The shut-in status of any well shall persist only so long as it is necessary to correct, through the exercise of good faith and due diligence, the condition giving the rise to the shut-in of the well.

16. Pugh Clause - In the event a pooled unit is created which encompasses land located outside the leased premises and zones, but not all, of the Leasehold premises, any drilling completing, testing, deepening operations or reworking operations on or production from a well located on that pooled unit shall continue this Lease in full force and effect but only as to that part of the lease premises combined within the pooled unit and only as to those formations and horizons found from the surface down to the deepest depth drilled, specifically, this lease shall automatically terminate two (2) years ("Extended Term") after the expiration of the primary term or any extension provided herein as to such portions of leased premises not contained within a pooled unit and those formations and horizons below the deepest depth drilled. However, Lessee may, at its option, pay the extension payment included in this lease one time, and one time only, prior to the expiration of the two (2) year Extended Term on the portions of the Leasehold not included in a production unit or below the deepest depth drilled to continue all of its rights to and to the Leasehold or surrender said portions of the Leasehold not included in a production unit or those formations and horizons found below the deepest depth drilled.

17. Location Approval - Before commencing surface disturbing operations on the Leased Premises, Lessee agrees to consult with Lessor on the location of all wells, roads, pipelines, gifts, and other equipment so as to minimize disrupting of Lessor's use of the Leased Premises. To the degree practicable, operations shall be designed and laid out to be concentrated in a single area so as to avoid unnecessary utilization of surface area. To the degree practicable, pipelines and roadways are to be within the same corridor. Without a separate written agreement between Lessor and Lessee, no pump stations, tank batteries, pipelines, dryers or separators shall be located on the Leased Premises unless they are for the sole purpose of transporting, processing, or treating gas from the Leased Premises or lands pooled or unitized therewith, and none shall not be located within than four hundred (400) feet from any dwelling or residential structure or two hundred (200) feet from any barn or other non-residential structure than on the Leased Premises without the Lessor's written consent.

18. Setbacks – No Drilling within four hundred (400) feet from any dwelling or residential structure or two hundred (200) feet from any barn or other non-residential structure then on the Leased Premises without the Lessor's written consent.

19. Well Location Fee – Lessee agrees to pay Lessor a well location fee in the amount of Ten Thousand Dollars ($10,000.00) for the initial well site, provided a well site is built on the surface owned by the lessor, and such land is covered by this lease. This Well Location Fee shall be for the entire compensation for all reasonable and customary damages caused by operations of Lessee, its employees, contractors, sub-contractors, agents and representatives, pursuant to and including but not limited to, the drilling, equipping, operating, repairing, reworking, maintaining, laying of well site gathering and flow lines, and for plugging of an oil and/or gas well on Lessor's property. Said compensation does not include damages to Lessor's surface area and vegetation from any catastrophic incidents (i.e. fires, sinkholes, etc.) caused by operations by Lessee, its employees, contractors, sub-contractors, agents or representatives.

20. Commencement of Operations – Commencement of Operations shall be defined as Lessee having secured a drilling permit from the State and further entering upon the herein premises with equipment necessary to build any access road(s) for drilling of a well subsequently followed within 6 months by a drilling rig for the spudding of the well to be drilled. Once drilling operations commence, any applicable delay rentals will no longer be required to maintain the lease.

21. Audit- Lessor shall have the right to request an itemized list of deductions from Lessee once in any 12 month period by written request.

22. Unitization/Pooling- No pooled unit for any well that includes lateral or horizontal drilling shall exceed six hundred forty (640) acres.

23. Payments to Lessee –To pay Lessor as Delay Rental, a rate of two thousand dollars ($2000.00) per net acre payable in advance for a period of five years, "initial term". The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof. Payment of any delay rental during the five year Primary Term shall be deemed paid to Lessor. If royalties paid to Lessor, for any period of time in effect except for that period the royalty payments, and no delay delay rental, then the delay rental shall be deemed either by the royalty payments, and no delay rental shall be owed for that period.

24. Payments – Lease payment will be due on or before September 7, 2011.

This addendum to lease dated 4 day of January, 2011 is consented herein, by:

Lessor:  K-S Shugert Farms, Limited Family Pa

_Kenneth R Shugert_
Printed Name: Kenneth R Shugert

_Sandra K Shugert_
Printed Name: Sandra K Shugert

Lessee:

Patriot Land Company, LLC

By: _____

Printed Name: Andrew Blackson

Its: President

209.00 KRS

End Exhibit 'a'
End Exhibit "B"

**PAID-UP**
**OIL & GAS LEASE**

740-489-5270

This Lease made 01-04-2011, by and between: **K and S Shugert Farms Limited Partnership, a Family Limited Partnership**, whose address is 63568 County Home Rd, Lore City, OH 43755 hereinafter collectively called "Lessor,"
and
Patriot Land Company, LLC, whose address is 7716 Depot Rd, Unit 1, Lisbon OH 44432, hereinafter called "Lessee."

WITNESSETH, that for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

**LEASING CLAUSE.** Lessor hereby leases exclusively to Lessee all the oil and gas (including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mined-out area, coal seam, and all communicating zones), and their liquid or gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, to operate, maintain, repair, and remove material and equipment; to use and occupy the subsurface for a wellbore or wellbores to drill across, through and under the Leasehold.

**DESCRIPTION.** The Leasehold is located in the Township of Union, in the County of **Belmont**, in the State of Ohio, and described as follows:

Township: 8   Range: 5
Section: 26,31,32 Tax Parcel No.: 39-00384.001, 39-00384.002, 39-00414.000, 39-00633.000, , 39-00415.000, 39-00635.002, 39-01414.000, 39-00648.002, 39-00416.000, 39-00636.000, 39-00637.000, 39-00634.002
and is bounded formerly or currently as follows:
On the North by lands of        ; I-70
On the East by lands of        ; Mauresberger



EXHIBIT
**1-D**

3828

On the South by lands of     ; R Shugert
On the West by lands of     ; R & F

including lands acquired from   , by virtue of deed dated   , and recorded in Belmont County Book: 237, at Page: 431; and described for the purposes of this agreement as containing a total of 331.39229999999998 Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument, or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land. Source deed : D798/764

     LEASE TERM. This Lease shall remain in force for a primary term of Five (5) years from 12:00 A.M.   01-04-2011 (effective date) to 11:59 P.M. ,01-03-2016 (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

     If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

     EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend

this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.

     NO AUTOMATIC TERMINATION OR FORFEITURE.
(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such

activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including but not limited to, making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR. In addition to the bonus payment paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership as follows:

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at a rate of five dollars ($5.00) per net acre per year payable in advance. The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

1. OIL: To deliver to the credit of Lessor a Royalty equal to fifteen percent (15%) of the gross revenue realized by Lessee for all oil and any constituents thereof produced and marketed from the Leasehold, less the cost to transport, handle, separate, meter, treat, process and market the oil.

2. GAS: To pay Lessor an amount equal to fifteen percent (15%) of the gross revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, gather, dehydrate, compress, market, meter, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) DELAY IN MARKETING: In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that is awaiting completion (such as hydraulic fracture stimulation), or that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D) SHUT-IN:  In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or lessee surrenders the Lease) and this Lease shall remain in full force and effect.  During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation.  In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) DAMAGES:  Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F) MANNER OF PAYMENT:  Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch.  Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP:  Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H) TITLE:  If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS:  Lessee may at its option pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means. In the event the leased lands are encumbered by a prior mortgage, then, notwithstanding anything contained herein to the contrary, Lessee shall have the right to suspend the payment of any royalties due hereunder, without liability for interest, until such time as Lessor obtains at its own expense a subordination of the mortgage in a form acceptable to Lessee.

(J) CHARACTERIZATION OF PAYMENTS:  Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked.  Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease.  Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K) PAYMENT REDUCTIONS:  If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above),

royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING. Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. Lessor agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease, and the local property tax assessment calculation of the lands covered by the Lease, or the deeded acreage amount, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES. Lessee shall not drill a well on the Leasehold within 300 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE. Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage. At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

DISPOSAL AND INJECTION WELLS. Lessor hereby grants to Lessee the right to drill wells and/or re-enter existing wells, including necessary location, roadway and pipeline easements and rights of way, on any part of the Leasehold or lands pooled or unitized therewith for the disposal and/or injection into any subsurface strata, other than a potable water strata, of air, gas, brine, completion and production fluids, waste water and any hydrocarbon related substances from any source, including, but not limited to wells on the Leasehold or lands pooled or unitized therewith or from properties and lands outside the Leasehold or lands pooled or unitized therewith, and to conduct all operations as may be required, for so long as necessary and required by Lessee for purposes as herein provided. If, at the expiration of the primary term, Lessee is disposing and/or injecting into any subsurface strata underlying the Leasehold or lands pooled or unitized therewith or conducting operations for such disposal and/or injection and this lease is not being maintained by any other provision contained herein and no other payments are being made to Lessor as prescribed hereunder, Lessee shall pay to Lessor the sum of one thousand dollars ($1,000.00) per year, proportionately reduced to Lessor's ownership in the Leasehold and surface as it bears to the full and

undivided estate, beginning on the next anniversary date of this Lease and said payment and term of this Lease, insofar as to terms and provisions contained herein applicable to disposal and injection wells, shall continue annually thereafter for so long as necessary and required by Lessee for purposes as herein provided and until all disposal and/or injection wells located on the Leasehold or on lands pooled or unitized therewith are plugged and abandoned. Lessor agrees that if required by Lessee, regulatory agency or governmental authority having jurisdiction, Lessor shall enter a separate Disposal and Injection Agreement with Lessee for the purposes as herein provided.

**TITLE AND INTERESTS.** Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease, the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

**LEASE DEVELOPMENT.** There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants. Provisions herein, including but not limited, to the prescribed payments, constitute full compensation for the privileges herein granted.

**COVENANTS.** This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts of God and/or third parties over whom Lessee has no control.

**ARBITRATION.** In the event of a disagreement between Lessor and Lessee concerning this Lease or the associated Order of Payment, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive remedy and cover all disputes, including but not limited to, the formation, execution, validity and performance of the Lease and Order of Payment. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

**ENTIRE CONTRACT.** The entire agreement between Lessor and Lessee is embodied herein and in the associated Order of Payment (if any). No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

**TITLE CURATIVE.** Lessor agrees to execute affidavits, ratifications, amendments, permits and other instruments as may be necessary to carry out the purpose of this lease.

**SURRENDER.** Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

**SUCCESSORS.** All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

**FORCE MAJEURE.** All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion,

insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY. This Lease is intended to comply with all applicable laws, rules, regulations, ordinances and governmental orders. If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall survive and continue in full force and effect to the maximum extent allowed by law. If a court of competent jurisdiction holds any provision of this Lease invalid, void, or unenforceable under applicable law, the court shall give the provision the greatest effect possible under the law and modify the provision so as to conform to applicable law if that can be done in a manner which does not frustrate the purpose of this Lease.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

SEE EXHIBIT "a" ATTACHED HERETO AND BY REFERENCE MADE A PART HEREOF.

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

**LESSOR**

Witness _____

*K+S Shugert Farms L.P.*
*by Kenneth Shugert G.P.*
Printed Name: K&S Shugert Farms

Witness _____

x *Kenneth Shugert*

Printed Name: _____

Witness _____

x *Sandra Shugert*

Printed Name: _____

## ACKNOWLEDGMENT

STATE OF _Ohio_ )
                   ) ss
COUNTY OF _Belmont_ )

On this _5_ day of _May_____, 2011, before me, a Notary Public, personally appeared _Kenneth Shupe_, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that he/she executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Robert Dickey, Notary Public
**STATE OF OHIO**
My Commission Expires May 19, 2013

Signature/Notary Public _____

Name/Notary Public (print): _____

My Commission Expires: _____

## ACKNOWLEDGMENT

STATE OF _Ohio_ )
                   ) ss
COUNTY OF _Columbiana_ )

On this _5_ day of _May_____, 2011, before me, a Notary Public, personally appeared _Andrew Blackwell_, who acknowledged himself to be the _Member_ of Patriot Land Company, LLC, and that in that capacity, being authorized to do so, executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Elizabeth S. Eckenbaugh, Notary Public
**STATE OF OHIO**
My Commission Expires February 16, 2016

Signature/Notary Public _____

Name/Notary Public (print): _____

My Commission Expires: _____

1.04 Patriot Lease 010411

## EXHIBIT "a"

This Exhibit "a" is attached to and made a part of that certain Oil and Gas Lease dated the   01-04-2011, by and between K & S Shugert Farms , as Lessor,

and

**Patriot Land Company, LLC**, as Lessee.  If any of the following provisions conflict with or are inconsistent with the printed provisions or terms of this Lease, the following provisions shall control.

**Lessor hereby warrants that Lessor is not currently receiving any bonus, rental, production royalty as the result of any prior oil and gas lease covering any or all of the subject premises, and that there are no commercially producing wells currently existing on the subject premises, or upon other lands within the boundaries of a drilling or production unit utilizing all or a part of the subject premises.**

1. **Governing Law** - This Agreement shall be governed by and construed in accordance with the laws of the Columbiana County Courts.
2. **Market Enhancement Clause** - It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, dehydrating and marketing the oil, gas and other products produced hereunder to transform the product into marketable form;  however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements.  However, in no event shall Lessor receive a price that is less than, or more than, the price received by Lessee.
3. **No Storage Rights Clause** - Lessee agrees the herein described Leased premises shall not be used for the purpose of gas storage as defined by the Federal Energy Regulatory Commission.  Any reference to gas storage contained in this lease is hereby deleted.  If Lessor wishes to enter into an agreement regarding gas storage using the leased premises with a third party, Lessor shall first give Lessee written notice of the identity of the third party, the price or the consideration for which the third party is prepared to offer, the effective date and closing date of the transactions and any other information respecting the transaction which Lessee believes would be material to the exercise of the offering.  Lessor does hereby grant Lessee the first option and right to purchase the gas storage rights by matching and tendering to the Lessor any third party's offering within 30 days if receipt of notice from Lessor.
4. **Water Testing** - Prior to the commencement of drilling operations by Lessee, Lessee shall test Lessor's water supply well if located within 500 feet (500') of the surface location of the proposed drilling well bore.  Should Lessor experience a material adverse change in the quality of Lessor's water supply as the result of the drilling of any such well by Lessee, during or within two months after the completion of Lessee's drilling operations, Lessee shall promptly after receipt of Lessor's written request, sample and test Lessor's water supply at Lessee's expense.  Should such test reflect a material adverse change as the result of Lessee's drilling operations, Lessee, at Lessee's expense, agrees to provide Lessor with potable water until such time as Lessor's water sources has been repaired or replaced with a source of substantially similar quality.
5. **No Disposal Clause** - The right to dispose of any waste products, including, but not limited to, waste water and/or brine upon the leased premises is specifically excluded.
6. **Use Of Water Clause** – Upon the express written consent of Lessor,  Lessee shall have the right to drill one water well on Lessor's premises for uses associated with Lessee's operations except said well shall not be used for injection, hydraulic fracking or drilling. The right to utilize any other potable water and/or water from currently existing wells, tanks, ponds, reservoirs or any

other source located on the leased premises is specifically excluded without the express written consent from the Lessor under a separate agreement.

7. **Timber** - Lessee and Lessor agree that prior to the removal of any and all marketable timber resulting from Lessee's operations under the terms of this Lease, a qualified third party forester shall conduct an appraisal, and Lessee shall pay Lessor the said appraisal value prior to harvesting.

8. **Clean Up** - On completion of any operations, Lessee shall restore the leased premises to pre-drilling conditions, remove all debris, equipment and personal property which Lessee placed on the leased premises (except for equipment needed for the operation of producing wells), which shall be removed within six (6) months after a well permanently ceases to produce.

9. **Prohibition Activities** - Lessee is prohibited from conducting aerial spraying upon any portion of Lease Premises. Lessee is prohibited from burning of brush or other waste materials upon any portion of the leased premises unless temporary during drilling. Lessee is prohibited from placing living quarters of any type on the leased premises. Lessee is prohibited from performing any activity which is not expressly permitted pursuant to the terms and conditions of this Lease.

10. **Reclamation** – Lessee shall construct or install all well sites, access roads and pipeline rights-of-way in manner which would minimize any related soil erosion. Further, all related surface reclamation shall be done in a manner which restores said land as nearly to original contours as reasonably possible.

11. **Fences and Gates** – Lessee shall promptly replace any fences removed by Lessee during its operations on said land and further shall construct gates on all access roads on said land upon request of Lessor

12. **Hold Harmless** – Lessee shall indemnify and hold Lessor harmless from any and all liability, liens, demands, judgments, suits, and claims of any kind or character arising out of, in connection with, or relating to Lessee's operations under the terms of this Lease, including, but not limited to, environmental issues, claims for injury to or death of any persons, or damage, loss or destruction of any property, real or personal, under any theory of tort, contract, or strict liability, Lessee further covenants and agrees to defend any suits brought against Lessor on any claims, and to pay any judgment against Lessor resulting from any suit or suits, together with all costs and expenses relating to any claims, including attorney's fees, arising from Lessees operations under the terms of this lease. Lessor, if it so elects, shall have the right to participate, at it sole expense, in its defense in any suits in which it may be a party, without relieving Lessee of the obligation to defend Lessor.

13. **Gas Compensation** - If, and only if, Lessor is entitled to receive free gas by virtue of the ownership of the surface of the leased premises on which the wellhead is located and either all the oil and gas underlying the same, or an undivided interest in the oil and gas underlying the same, or the express record title right to receive free gas, then upon approval of Lessor's written request for free gas, and after Lessor has obtained 100% written consent from all owners having the legal right to receive revenue from a productive well on the leased premises, and Lessor's execution of Lessee's Delivery of Free Gas and Overburn Gas productive Agreement, one (1) Lessor may lay a line to any one (1) producing gas well on the leased premises and take up to two hundred thousand (200,000) cubic feet of gas during any single twelve (12) month period for domestic use in one currently existing primary dwelling owned at all times by Lessor and located within a one thousand (1,000') foot radius from said well on the leased premises; subject, however to such well being capable of producing in commercial quantities and of commercial quality suitable for domestic use; the existence and availability of a local distribution company willing to administer, control, monitor, and service such free gas usage to the specifications and requirements of Lessee; and subject further to the use, maintenance, operation, production, limited deliverability, and right of shut-in and/or plugging and abandonment by Lessee of its well(s), equipment and pipelines on the leased premises. Lessor shall secure such gas by service line laid to and connected to such well on said leased premises in accordance with all applicable laws, rules and regulations, the point of connection to be designated by Lessee and Lessor shall assume the entire risk and all expenses associated with securing and using such gas and agrees, to the fullest extent of applicable law, to

release and indemnify Lessee from and against any and all claims or causes of action arising there from or relating thereto. If Lessor in any year uses in excess of the quantity provided for herein, Lessor shall pay for all overburn gas at the current established retail rate in the area or at the rated charged by the local distribution company administering the free gas usage, but Lessee assumes no obligation to furnish Lessor with gas in excess of the quantity provided herein. The measurement and regulation of such gas shall be by meter regulators furnished by Lessee, subject to Lessee's approval, and set at the tap on the well. Notwithstanding the foregoing provisions, in the event the leased premises are made a part of a unit or pooled with other acreage and the well(s) has been drilled on another lease, the Lessor hereunder will not be entitled to use wellhead gas, free or otherwise. The rights granted herein related to free gas are not assignable or transferable to a party not currently owning an interest in the leasehold premises. Notwithstanding the foregoing, the specific terms and conditions of free gas use shall be governed and controlled by the Agreement for Delivery of Free Gas and Overburn Gas. Lessee shall be fully relieved of any further obligation to provide free gas or alternative payment to Lessor if any of the conditions provided hereinabove are not satisfied. At the time application is made for free gas, Lessee shall have the option to make an annual cash payment to the qualified applicant of One Thousand and 00/100 Dollars ($1,000.00) in lieu of providing free gas and said sum shall thereafter permanently discharge Lessee's obligation under this lease to provide gas free of cost to Lessor, his successors, heirs and assigns.

14. **No Other Minerals** - This lease shall cover only oil and gas and related hydrocarbons (but no coal bed methane) that may be produced from the well bore; and all other minerals including, but not limited to, lignite coal, uranium, sulfur, gravel, copper, and metallic ores are not included in this Lease.

15. **Shut In** - It is understood and agreed that this lease may not be maintained in force for any continuous period of time longer than four (4) consecutive years after the expirations of the primary term hereof solely by the provision of the shut-in royalty clause. The shut-in status of any well shall persist only so long as it is necessary to correct, through the exercise of good faith and due diligence, the condition giving the rise to the shut-in of the well.

16. **Pugh Clause** – In the event a pooled unit is created which encompasses land located outside the lease premises and some, but not all, of the Leasehold premises, any drilling completing, testing, deepening operations or reworking operations on or production from a well located on that pooled unit shall continue this Lease in full force and effect but only as to that part of the lease premises contained within the pooled unit and only as to those formations and horizons found from the surface down to the deepest depth drilled; specifically, this lease shall automatically terminate two (2) years ("Extended Term") after the expiration of the primary term or any extension provided herein as to such portions of leased premises not contained within a pooled unit and those formations and horizons below the deepest depth drilled. However, Lessee may, at its option, pay the extension payment included in this lease one time, and one time only, prior to the expiration of the two (2) year Extended Term on the portions of the Leasehold not included in a production unit or below the deepest depth drilled to continue all of its rights in and to the Leasehold or surrender such portions of the Leasehold not included in a production unit or those formations and horizons found below the deepest depth drilled.

17. **Location Approval** - Before commencing surface disturbing operations on the Leased Premises, Lessee agrees to consult with Lessor on the location of all wells, roads, pipelines, gates, and other equipment so as to minimize disruption of Lessor's use of the Leased Premises. To the degree practicable, operations shall be designed and laid out to be concentrated in a single area so as to avoid unnecessary utilization of surface areas. To the degree practicable, pipelines and roadways are to be within the same corridor. Without a separate written agreement between Lessor and Lessee, no pump stations, tank batteries, pipelines, dryers or separators shall be located on the Leased Premises unless they are for the sole purpose of transporting, processing, or treating gas from the Leased Premises or lands pooled or unitized therewith, and those shall not be located nearer than, (and no well shall be drilled nearer than) four hundred (400) feet from any dwelling or

residential structure or two hundred (200) feet from any barn or other non-residential structure
then on the Leased Premises without the Lessor's written consent.

18. **Setbacks** - No Drilling within four hundred (400) feet from any dwelling or residential structure
or two hundred (200) feet from any barn or other non-residential structure then on the Leased
Premises without the Lessor's written consent.

19. **Well Location Fee** - Lessee agrees to pay Lessor a well location fee in the amount of Ten
Thousand Dollars ($10,000.00) for the initial well site, provided a well site is built on the surface
owned by the lessor, and such land is covered by this lease. This Well Location Fee shall be for
the entire compensation for all reasonable and customary damages caused by operations of Lessee,
its employees, contractors, sub-contractors, agents and representatives, pursuant to and including,
but not limited to, the drilling, equipping, operating, repairing, reworking, maintaining, laying of
well site gathering and flow lines, and for plugging of an oil and/or gas well on Lessor's property.
Said compensation does not include damages to Lessor's surface area and vegetation from any
catastrophic incidents (i.e. fires, sinkholes, etc.) caused by operations by Lessee, its employees,
contractors, sub-contractors, agents or representatives.

20. **Commencement of Operations** – Commencement of Operations shall be defined as Lessee
having secured a drilling permit from the State and further entering upon the herein premises with
equipment necessary to build any access road(s) for drilling of a well subsequently followed
within 6 months by a drilling rig for the spudding of the well to be drilled. Once drilling
operations commence, any applicable delay rentals will no longer be required to maintain the
lease.

21. **Audit**- Lessor shall have the right to request an itemized list of deductions from Lessee once in
any 12 month period by written request.

22. **Unitization/Pooling**- No pooled unit for any well that includes lateral or horizontal drilling shall
exceed six hundred forty (640) acres. *#2090.00*

23. **Payments to Lessor** -To pay Lessor as Delay Rental, a rate of two thousand dollars (~~$2000.00~~)
per net acre payable in advance for a period of five years, "initial term". The parties hereto agree
that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due
to Lessor during the primary term hereof. Payment of any delay rental during the five year
Primary Term shall be deemed paid in advance as part of the initial bonus payment to Lessor. If
royalties paid to Lessor, for any period of time in affect except for that period the amount of the
delay rental, then the delay rental shall be deemed offset by the royalty payments, and no delay
rental shall be owed for that period.

24. **Payment** – Lease payment will be due on or before June 30, 2011.

This addendum to lease dated     day of     , 2011 is consented hereto, by:

Lessor:

Lessee:

Printed Name: X *Kenneth Shugert*
    X *Sandra Shugert*

Patriot Land Company, LLC
By: *Andrew W Blackburn*

Printed Name: *Andrew W Blackburn*
Its: *Member*